591 A.2d 544

OWENS–ILLINOIS, et al.

v.

Othello ARMSTRONG, et al.

Frederick STORMER, et al.

v.

EAGLE–PICHER INDUSTRIES, INC.

No. 933, Sept. Term, 1990.

Court of Special Appeals of Maryland.

June 26, 1991.

**700**

702

Patrick C. Smith (F. Leigh Swann and Whiteford, Taylor & Preston, on the brief), Baltimore, for appellant, Owens–Illinois.

Shepard A. Hoffman (Harry Goldman, Jr., William A. Musto and Goldman & Skeen, P.A., on the brief), Baltimore, for appellants, Stormer and Celozzi.

Shepard A. Hoffman (William Musto, Harry Goldman, Jr. and Goldman & Skeen, P.A., on the brief), Baltimore, for appellees, Armstrong and Wood.

Kristine A. Crosswhite, Miles & Stockbridge, on the brief, Baltimore, for appellee, Owens Corning Fiberglas.

Diane V. D'Aiutolo, Frederick C. Leiner and Tydings & Rosenberg, on the brief, Baltimore, for appellee, Fibreboard Corp.

Edward F. Houff and Church & Houff, on the brief, Baltimore, for appellee, GAF Corp. and Armstrong World Industries, Inc.

Patrick C. Smith, F. Leigh Swann and Whiteford, Taylor & Preston, on the brief, Baltimore, for appellees, Owens–Illinois, Inc., Keene Corp. & ACandS, Inc.

Argued before BISHOP, ALPERT and DAVIS, JJ.

BISHOP, Judge.

This appeal involves the consolidated cases of three shipyard workers, Othello Armstrong, Forrest Wood, and Dominic Celozzi, and one warehouseman, Frederick Stormer, who sued companies that manufactured, installed or supplied asbestos-containing insulation products. All four cases were submitted to the jury on the claims of negligence and strict liability, based on the contention that the asbestos-containing insulation products were defective. For clarity, we shall divide our discussion of the cases into two sections. In section I, we will address the appeal of Owens–Illinois, Inc. from judgments in favor of Othello Armstrong and Forrest Wood and his wife, Loretta. In section II, we will address the appeals of Frederick Stormer and his wife, Alice, and Dominic Celozzi and his wife, Beatrice, from judgments in favor of Eagle–Picher Industries, Keane Corporation and Owens–Corning Fiberglas, and ACandS, Inc., Armstrong World Industries, Celotex Corporation, Eagle–Picher Industries, Fiberboard Corporation, GAF Corporation, Owens–Corning Fiberglas and Owens–Illinois, Inc., respectively.

## I.

The appeal of Owens–Illinois, Inc. is derived from the cases of Othello Armstrong versus Eagle–Picher Industries, Owens–Corning Fiberglas and Owens–Illinois, Inc. and Frederick and Loretta Wood versus Owens–Corning Fiberglas and Owens–Illinois, Inc. The jury returned verdicts in favor of Armstrong and the Woods and against each defendant. Pursuant to Md.Cts. & Jud.Proc.Code Ann.

§ 11–109(b) (1989) [1], the jury itemized their damage awards. To Armstrong, the jury awarded $730,000 in compensatory damages of which $5,000 was for future medical expenses and the remaining $725,000 for non-economic damages. To Forrest and Loretta Wood, the jury awarded $635,000 in compensatory damages of which $22,000 was for injury to the Woods' marital relationship. The jury also determined that there was sufficient evidence to allow an award of punitive damages against Owens–Illinois, Inc. and Owens–Corning Fiberglas. After the compensatory damage awards, but before the punitive damage amount was determined, Owens–Corning Fiberglas settled both cases. Armstrong settled for $304,166.33 of which $243,333.33 was designated as settlement of the compensatory damage award and $60,833 as settlement of the punitive damage claim. The Woods settled for $409,625 of which $328,500 was designated as settlement of the compensatory damage award and $82,125 as settlement of the punitive damage claim. Two days later, the jury returned a punitive damage award against Owens–Illinois, Inc. of $1,000,000 in each case.

At a post-trial motions hearing, the compensatory damage award in the Armstrong case was reduced by one-third to $486,666.67 due to the settlement with Owens–Corning Fiberglas pursuant to the Uniform Contribution Among Tortfeasors Act, Md.Code Ann. art. 50, § 19 (1986). The compensatory damage award in the Wood case was reduced by one-half to $317,500 for the same reason. Owens–Illinois,

---

1. Section 11–109(b) provides:

   *Itemized award*—As part of the verdict in any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, the trier of fact shall itemize the award to reflect the monetary amount intended for:
   (1) Past medical expenses;
   (2) Future medical expenses;
   (3) Past loss of earnings;
   (4) Future loss of earnings;
   (5) Noneconomic damages; and
   (6) Other damages.

Inc. and Eagle–Picher Industries filed motions for new trial, revision of the judgment, judgment notwithstanding the verdict and remittitur. The court denied the motions and entered final judgments on the verdicts. Owens–Illinois, Inc. and Eagle–Picher Industries appealed. The appeal of Eagle–Picher Industries, however, has been stayed by its filing of a bankruptcy petition under Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Ohio and thus, Owens–Illinois, Inc. is the sole appellant in these two cases.

## Issues Presented

Appellant Owens–Illinois, Inc. presents seven issues which we have re-worded and re-ordered as follows:

1. Whether the court erred when it failed to admit into evidence a report of a dust count conducted at its Baltimore shipyards by the Bethlehem Steel Corporation;

2. Whether the court committed reversible error when, in its jury instructions, it refused to define the term "substantial factor";

3. Whether the court erred when it denied appellant's motion for judgment on the issue of proximate cause;

4. Whether the court erred when it denied appellant's motion for judgment on the issue of punitive damages because appellees Armstrong and the Woods failed to introduce sufficient evidence that Kaylo, an asbestos-containing product, was made by appellant with substantial knowledge of a danger to appellees and a gross indifference to that danger;

5. Whether the court erred when it failed to reduce Armstrong's compensatory damages award pursuant to Md. Cts. & Jud.Proc.Code Ann. § 11–108 (1989) which places a cap of $350,000 on non-economic damages;

6. Whether the award of punitive damages violated appellant's right to due process of law by subjecting it to multiple punishments for the same wrong; and

7. Whether the court erred when it did not off-set the jury awards for appellees Armstrong and the Woods by both the compensatory and punitive amounts of the settlements with Owens–Corning Fiberglas.

## Facts

This appeal concerns the exposure of appellees Armstrong and Wood to Kaylo, an asbestos-containing product used for industrial high temperature thermal insulation in such forms as pipe covering and block insulation.[2] Kaylo was manufactured and sold by Owens–Illinois, Inc. from 1948 to 1958. In 1958, Owens–Illinois, Inc. sold the Kaylo product line to Owens–Corning Fiberglas.

Asbestosis is a pulmonary disease caused by the inhalation of asbestos fibers. It is a progressive condition which causes shortness of breath and difficulty in breathing. The disease is present and active from the time the first fiber gets into the lungs. Depending on the amount of damage to the lungs, the symptoms may not appear for twenty or thirty years.

Othello Armstrong was a laborer and then a welder who was employed at various Bethlehem Steel shipyards from 1942 to 1963, where he worked in the engine and boiler rooms of ships. As a laborer, Armstrong swept up the dust and debris left by others who had cut and installed Kaylo pipe coverings. As a welder, he worked in closed boiler and engine rooms while pipe coverers cut and installed Kaylo pipe coverings and boilermakers cut and fitted Kaylo insulation blocks onto boilers. The cutting, fitting and installation of Kaylo pipe coverings and insulation blocks was extremely dusty work. In 1963, he left the shipyards to work as a stationary engineer at Eudowood Plaza. It appears from the record that Armstrong was not exposed to

---

2. This product is in the form of a 50–60 pound hard block which is separated into manageable pieces with a wooden hammer or a saw. Water is then added to it to make it malleable and it is worked by hand with a trowel, like cement.

Kaylo insulation products during the time he worked at Eudowood Plaza from 1963 until his retirement in 1980.

Forrest Wood was a rigger at the Bethlehem Steel Key Highway shipyard from 1941 to 1975. As a rigger, Wood primarily assisted other tradesmen in the removal of equipment and materials from ships. This work included assisting pipefitters in the removal and installation of pipe coverings. This work, like that performed by Armstrong, was extremely dusty.

Additional facts will be presented in the discussion of each issue.

*Discussion*

1.

*Whether the court erred when it failed to admit into evidence a dust count report conducted by the Bethlehem Steel Corporation at its Baltimore shipyards.*

The dust count report is a four page document written by the Industrial Health Engineer of the Bethlehem Steel Corporation who investigated the exposure of employees to asbestos dust at various Bethlehem Steel Corporation shipyards. The defendants moved for the admission of the dust count report and the plaintiffs objected on the grounds that it was not relevant or trustworthy. Although the court appeared to find that the report qualified as a business record, it refused to admit the report because it found it to be untrustworthy and unreliable. The defendants offered to have a custodian of records testify to the foundational requirements necessary to qualify it as a business record pursuant to Md.Cts. & Jud.Proc.Code Ann. § 10–101 (1989). The court found that a custodian of records could not salvage the admissability problems of the dust count report and restated its ruling. We affirm the ruling of the trial court not only on the basis of that court's reasoning, but also because the dust report does not qualify as a business record.

"The rule in Maryland is that business records may be introduced, even though hearsay in nature, when the entry meets the test of 'necessity and circumstantial guarantee of trustworthiness.'" *Burroughs Int'l Co. v. Datronics*, 254 Md. 327, 348, 255 A.2d 341 (1969) (citations omitted). The criteria are codified in Md.Cts. & Jud.Proc.Code Ann. § 10–101 (1989) which provides in part:

A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.... The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

According to 5 Wigmore on Evidence § 1522 (1974), the typical record entry made in the regular course of business has a circumstantial guarantee of trustworthiness because:

(1) the needs of the entrant and the business require a habit of accuracy and the influence of this habit may be relied upon to prevent mistakes and counteract the possible temptation to make misstatements purposely;

(2) the regular dependence of the business upon the entries will almost certainly detect any errors or misstatements and thus misstatements can be made safely only by a systematic and comprehensive plan of falsification accomplishable only by the most daring and unscrupulous; or

(3) in addition to the first two reasons, the entrant made the record under a duty to an employer or supervisor and thus is under the additional risks of censure and disgrace for any inaccuracies.

Examples of business records which have been found to be admissible under this exception to the hearsay rule are "payrolls, accounts receivable, accounts payable, bills of lading and the like," *Palmer v. Hoffman*, 318 U.S. 109, 114, 63 S.Ct. 477, 480, 87 L.Ed. 645 (1943); statements in a medical record which are "pathologically germane" to the physical condition which caused the patient to seek medical

assistance, *Sarrio v. Reliable Contracts Co.*, 14 Md.App. 99, 101, 286 A.2d 183 (1972); items in a police report which are within the personal observation of the investigating officer, *Aetna Casualty & Surety v. Kuhl*, 296 Md. 446, 454, 463 A.2d 822 (1983); and reports required by law, *Taylor v. Baltimore & Ohio Railroad Co.*, 344 F.2d 281, 285 (2d Cir.1965), *cert. denied*, 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965); *Lewis v. Baker*, 526 F.2d 470, 473–74 (2d Cir.1975).

In *Palmer*, 318 U.S. 109, 63 S.Ct. 477, the Supreme Court held that an accident report made by a railroad of its own initiative which contained a statement of an employee's version of an accident was not admissible as a record made in the regular course of business. The Supreme Court detailed the reasons why the report of a private investigation is not admissible under the business record exception to the hearsay rule.

An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made "in the regular course" of the business.... If it did, then any law office in the land could follow the same course.... We would then have a real perversion of a rule designed to facilitate admission of records which experience had shown to be quite trustworthy. Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports.... The result would be [to] ... cover any system of recording events or occurrences provided it

was "regular" and though it had little or nothing to do with the management of the business as such.

*Id.* 318 U.S. at 113, 63 S.Ct. at 480. Although stated differently, these findings by the Supreme Court are consistent with the reasons for circumstantial trustworthiness set forth in Wigmore, *supra.* The report was properly excluded because the railroad did not depend on the report, or others like it, to run the daily operation of its railroad business and, thus, it could not be assumed that the report was a product of a necessary habit of accuracy. Moreover, inaccuracies in the report would not have had a detrimental effect on the railroad and therefore would not have been detected by the almost continuous use of the information contained therein. Finally, the entrant was not under a duty to a superior to make the report objectively accurate, and thus the report contained the railroad's version of events.

Similarly, in the case *sub judice,* the dust count report does not meet the criteria of a business record. The investigation and report were not required by law, but were made at the request of one of the company vice-presidents. On its face, the report appears to be a single or, at most, irregular, request. Nevertheless, even if dust count reports were made regularly by Bethlehem Steel Corporation, there was nothing to show that they are a necessary component of the daily operation of its business as a steel company. Therefore, the report is not inherently trustworthy as the product of a necessary habit of accuracy, and any inaccuracies would have remained undetected because Bethlehem Steel Corporation did not regularly rely on its contents. Moreover, because Bethlehem Steel Corporation did not apparently depend on the accuracy of the information contained in the report, we cannot infer that the motive behind its creation was objective accuracy rather than the creation of a subjective version of events. The report lacked specificity in the description of the controls in the investigation. The report does not provide a measure of the amount of asbestos dust present during the dust counts, the distance

between those carrying dust collecting air filters and the source of the asbestos dust or the amount of time the air filters sampled the asbestos dust that was present. There is nothing that a custodian of records could add to alter this ruling.

This dust count report is also clearly distinguishable from a police report. The making of a police report is a regular requirement of police duty. The making of the dust count report is not a requirement of operating Bethlehem Steel Corporation. Police reports are made by third party police officers. The dust count report was made by Bethlehem Steel Corporation for its own use.

The trial court did not exclude the report because it failed the business record test but, rather, for unreliability, based on substantially the same reasons that we have stated *supra*. In other words, the reasons the trial court gave were those that disqualify the report as a business record. The Court did not err in excluding the report either because of its lack of reliability for the reasons it gave or because, as we hold, it did not qualify as a business record for the same reasons.

### 2.

*Whether the court committed reversible error when it failed to define the term "substantial factor" in the instructions to the jury.*

■ The court instructed the jury as follows:

In order for a plaintiff to recover against a particular defendant, certain things must be shown—must be proved by the plaintiffs by a preponderance of the evidence. You must determine whether each plaintiff has proven by a preponderance of the evidence that he has asbestosis, he worked in proximity to and inhaled respirable asbestos fibers from the products of a particular defendant. It must be shown that a product or product manufactured or supplied by that defendant, by a particu-

lar defendant was a substantial factor in causing the asbestosis.

If no product manufactured or supplied by a particular defendant was a substantial factor in causing the asbestosis, then that defendant has no responsibility, and the defendant is out right away.

Unless there is a product that was manufactured or supplied by a particular defendant which was a substantial factor in causing the asbestosis, there is no responsibility on the part of that defendant.

Appellant contends that this instruction did not define sufficiently the term "substantial factor" and proposed the following instruction which included an expanded explanation:

Question # 4 on the jury interrogatories requires you to make a finding as to whether exposure to the products of a particular defendant was a substantial factor in causing asbestosis.

The products of a particular defendant may be considered a legal cause of an injury only if the exposure of a particular plaintiff to those products was a substantial factor in causing the injury. The word substantial used in this context means that the products must have had such an effect in producing the harm as to lead reasonable men to believe that the exposure to those products by themselves was a direct cause of the injury.

The plaintiffs must prove by a preponderance of the evidence that inhaled, respirable asbestos fibers from the asbestos products of a particular defendant were a substantial cause of asbestosis. In order to prove this, the plaintiffs must show that each of them worked in proximity to any of the defendants' asbestos-containing products with enough frequency and with enough regularity so that the inhaled fibers from the products substantially contributed to the claimed asbestosis of each plaintiff.

In *Eagle–Picher v. Balbos,* 84 Md.App. 10, 42–45, 578 A.2d 228 (1990), we addressed the same issue under similar

circumstances. In fact, the instruction given and the alternate requested instruction in the case *sub judice* were almost word for word from their counterparts in *Balbos.* In *Balbos*, we divided the alternate instruction into three parts which were summarized as "(1) the product of a *particular* defendant, (2) was a *substantial* factor in causing the plaintiffs' injuries, and (3) each plaintiff worked in *proximity* to these products with *frequency* and *regularity.*" *Id.* at 44, 578 A.2d 228 (emphasis in original). As in *Balbos*, the controversy in the case *sub judice* centers around the third portion of the instruction—whether it was sufficient to state that it must be shown that each plaintiff worked "in proximity to respirable asbestos fibers" without adding "with frequency and regularity." We believe it was.

None of the medical experts quantified the exact exposure necessary to cause asbestosis. It was for the jury to determine whether a plaintiff was exposed to each defendant's asbestos product so that he inhaled respirable fibers and, if they found the answer to be yes, to determine whether the inhalation was sufficient to be a substantial factor in causing the plaintiff's asbestosis.

In *Balbos*, we quoted with approval from Prosser and Keaton, *The Law of Torts* § 41, at 267 (5th ed. 1984) which stated, "It has been considered that 'substantial factor' is a phrase sufficiently intelligent to furnish an adequate guide in instructions to the jury, and that it is neither possible nor desirable to reduce it to any lower terms." *Id.* at 45, 578 A.2d 228. The instruction on this issue given by the court *sub judice*, and the proposed instruction are virtually the same instructions that were before this court in *Balbos.* We rely on our reasoning in that case and hold that the court's instruction fairly and accurately conveyed the term "substantial factor" and did not err when it refused to grant appellant's requested instruction. Md. Rule 2–520(c).[3]

---

**3.** Md. Rule 2–520(c) provides:
  The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or

### 3.

*Whether the court erred when it denied appellant's motion for judgment on the issue of proximate cause.*

█ It is undisputed that appellant never warned appellees Armstrong and Wood about the dangers of asbestos exposure from Kaylo products. Appellant contends, however, that the court erred when it did not grant its motion for judgment pursuant to Md. Rule 2–519, because there was no direct· evidence that either Armstrong or Wood would have heeded warnings had they been given. We disagree and explain.

Md. Rule 2–519(b) provides:

When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

The standard by which a trial judge should evaluate a motion for judgment is the same as that applied when ruling on a judgment n.o.v., Md. Rule 2–532, i.e. "[a] party is not entitled to judgment [as a matter of law] unless evidence on the issue and all inferences fairly deducible therefrom, when viewed in the light most favorable to the party against whom the motion is made, are such as to permit only one conclusion with regard to the issue." *Smith v. Miller,* 71 Md.App. 273, 278, 525 A.2d 245 (1987). In other words, "if there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted· to the jury...." *Mont-*

---

by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

*gomery Ward & Co. v. McFarland,* 21 Md.App. 501, 513, 319 A.2d 824 (1974).

Upon review of the record, we find direct evidence that Wood would have heeded warnings about the health hazards of Kaylo products had they been given. On direct examination, Wood stated, "Nobody told you to get—that it [Kaylo] was unhealthy or that it would hurt you. If they had, I would have got [sic] out of there." This is sufficient to defeat appellant's motion for judgment with regard to Wood. We did not find any direct evidence, however, that appellee Armstrong would have heeded health warnings had they been given.

Appellant contends that it was entitled to judgment as a matter of law because there was no direct evidence that Armstrong would have altered his behavior had he been warned, and there was evidence that he smoked cigarettes from 1966 until he quit in the mid–1970's despite mandatory health warnings on cigarette packaging. Therefore, according to appellant, the lack of a warning cannot be the proximate cause of Armstrong's asbestosis. We disagree because Md. Rule 2–519(b) requires that we view not only the direct evidence, but "all inferences fairly deducible therefrom" in the light most favorable to the non-moving party before we grant judgment as a matter of law. The issue then becomes whether it may be inferred from the facts and circumstances presented that Armstrong would have heeded any warnings had they been given.

Proximate cause is a necessary element of a cause of action in both negligence, *Yousef v. Trust Sav., F.S.B.,* 81 Md.App. 527, 535–36, 568 A.2d 1134 (1990), and strict liability, *Phipps v. Gen. Motors Corp.,* 278 Md. 337, 344, 363 A.2d 955 (1976), and it may be proven by circumstantial evidence. *McSlarrow v. Walker,* 56 Md.App. 151, 159, 467 A.2d 196 (1983), *cert. denied,* 299 Md. 137, 472 A.2d 1000 (1984); *Rafferty v. Weimer,* 36 Md.App. 98, 102, 373 A.2d 64 (1977). In a strikingly similar situation, the Second Circuit in *Raney v. Owens–Illinois, Inc.,* 897 F.2d 94 (2d

Cir.1990), upheld the District Court's refusal to decide this issue as a matter of law.

Ultimately, the issue is whether the facts and circumstances presented by the plaintiff in a particular case permit a jury reasonably to infer that a warning, reasonably required, would have been heeded. In this case, it was reasonable to infer that Raney would have heeded a manufacturer's warning. There was no evidence that Raney was aware of asbestos hazards, and might not agree that an asbestos worker would have sought other employment had he been warned of asbestos hazards, a prediction as to what a worker, alerted to the hazards, would have done is generally within the range of reasonable dispute that makes matters appropriate for submission to a jury. Evidence that Raney, who had begun smoking and perhaps had become addicted years before cigarette health warnings appeared, did not stop smoking after such warning, even if admissibility is assumed, is, at most, a circumstance for the trier of fact to consider in deciding whether an asbestos warning would have been heeded. Such evidence does not preclude a finding in plaintiff's favor. As Judge Dearie [of the District Court] noted, a jury could reasonably conclude that Raney would have adjusted his conduct more significantly to asbestos warnings than to cigarette warnings or that his union would have precipitated action to protect his welfare.

*Id.* at 96. We find the reasoning in *Raney* persuasive for it is in accord with the natural and general rule that persons are presumed to act for self-preservation absent *proof* to the contrary. *Md. Central R.R. v. Neubeur,* 62 Md. 391, 402 (1884); *Nizer v. Phelps,* 252 Md. 185, 204, 249 A.2d 112 (1969).

In the case *sub judice,* Armstrong was unaware of the health hazards of the asbestos in the dust from Kaylo products. Armstrong was also a smoker for forty years. This, however, is not enough evidence to find as a matter of law that he would have ignored warnings about the dangers of asbestos. Viewing this evidence and the reasonable

inferences therefrom as enunciated in *Raney, Neubeur* and *Nizer* in the light most favorable to Armstrong, we find the evidence sufficient for a jury to infer, reasonably, that Armstrong would have heeded any warnings given because people generally act to protect themselves from known dangers. We hold that there was sufficient evidence for a fact finder to infer that the failure of appellant to warn him of the health hazards of exposure to the dust from Kaylo products was the proximate cause of his asbestosis. Consequently, we hold that the motion for judgment was properly denied.

4.

*Whether the court erred when it denied appellant's motion for judgment on the issue of punitive damages because appellees Armstrong and the Woods failed to introduce sufficient evidence that Kaylo, an asbestos-containing product, was made by appellant with substantial knowledge of a danger to appellees and a gross indifference to that danger.*

In *Eagle–Picher v. Balbos,* we set forth the evidentiary standard for an award of punitive damages.

> Wanton or reckless conduct, as opposed to actual malice, will suffice to support an award of punitive damages in a product liability action. Wanton and reckless conduct, however, requires far more than mere negligence, or what may be casually inferred from it. It requires *direct evidence* of substantial knowledge on the part of the manufacturer that the product is, or is likely to become, dangerous, and a gross indifference to that danger.

84 Md.App. at 72–73, 578 A.2d 228 (citations omitted) (emphasis in original). In the case *sub judice,* the jury awarded punitive damages of $1,000,000 against appellant in each case. We will reverse only if the appellees failed to present any evidence, as required by the implied malice standard, of appellant's wanton indifference or reckless disregard for

the rights of others. *Exxon Corp. v. Yarema,* 69 Md.App. 124, 163, 516 A.2d 990 (1986).

Appellees produced evidence that appellant possessed substantial knowledge that Kaylo was, or was likely to become, dangerous. By 1935, the medical and industrial literature had established that asbestos could cause life-threatening diseases in humans. It is reasonable to charge appellant with this knowledge. *See Balbos,* 84 Md.App. at 77, 578 A.2d 228.

In February 1943, appellant contacted Saranac Laboratories to have them examine the health hazards of airborne dust from Kaylo insulation products to employees "in the plant where the material is made or where it may be sawed to desired dimensions, and also considered from the standpoint of applicators or erectors at the point of use." One month later, Saranac Laboratories notified appellant that the composition of Kaylo suggested that it "had all the ingredients of a first class hazard." Appellant instructed Saranac Laboratories to continue its investigations.

In November 1948, Saranac Laboratories issued to appellant an interim report which stated that Kaylo is capable of causing asbestosis in test animals and "should be handled industrially as a hazardous dust." The interim report also stated that "very small numbers of [asbestos] fibers are capable of producing asbestosis," that the development of asbestosis may be delayed and that a Kaylo safety program was necessary. The interim report was forwarded to appellant with a cover letter which stated that Kaylo is capable of causing asbestosis and that Kaylo must be regarded as a potentially hazardous material. The cover letter closed with the following statement:

[O]ur findings regarding Kaylo are less favorable than anticipated. However, since Kaylo is capable of producing asbestosis, it is better to discover it now in animals than later in industrial workers. Thus the company, being forewarned, will be in a better position to institute adequate control measures for safeguarding exposed employees and protecting its own interests.

In a letter from Saranac Laboratories dated June 1, 1950, addressed to W.G. Hazard of the Industrial Relations Division of Owens–Illinois Glass Company, Saranac warned that

at this time ... the findings permit [a conclusion that] Kaylo dust on inhalation by experimental animals ... does produce the asbestotic type of reaction in the lungs and, therefore, we believe every precaution should be taken to minimize exposure of industrial employees.

Again, on February 7, 1952, Saranac, in the letter transmitting its final report,[4] stated:

The results of the investigation with animals show that Kaylo dust is capable of producing a peribronchiolar fibrosis typical of asbestosis.... Although extrapolation from animal to human experience is difficult, nevertheless the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust. Therefore, control measures should be directed to reducing the amount of atmospheric dust, especially at those points of operation where dust is generated. Our report of May 29, 1951, concerning the industrial hygiene survey may be of help to you in this regard.

Finally, on October 5, 1955, in an intra-company memorandum, appellant expressed its knowledge that Kaylo dust could cause asbestosis.

Appellees also produced evidence that appellant exhibited a gross indifference to the dangers of Kaylo products. As early as 1946, the generally accepted safe level of exposure was five million particles of asbestos dust per cubic foot of air (mppcf). Five mppcf is invisible to the unaided eye. Fifteen mppcf in perfect light can barely be seen by the unaided eye. Five mppcf, however, was intended as a guide and not as a fine line between safe and dangerous conditions.

---

**4.** In Balbos, we noted, "[t]he report, however, as does other available medical literature, only documents hazards involved with heavy exposure to the product's dust generated during the manufacturing and application process." *Balbos,* 84 Md.App. at 77–78, 578 A.2d 228.

Appellees produced evidence that they were exposed to clouds of asbestos dust that covered their bodies. Wood testified that the dust "would fly like snowflakes" all over the place. When a valve was broken, the dust would circulate all around and on everybody close to it. Armstrong testified that the dust from the insulation

"was on your arms, on your clothes, in your nose and your eyebrows and mustache ... and your hair, wherever your head wasn't covered, it was there."

In November 1952, appellant began a safety program for its workers in the warehouse and shipping departments of its Berlin, New Jersey Kaylo Plant which included chest x-rays, the installation of exhaust equipment and the distribution of respirators. No safety program, however, was suggested or initiated for workers involved in the application of Kaylo products. Appellant also failed to place warnings on its Kaylo products and did not distribute any literature warning about the known hazards of asbestos exposure from Kaylo products. In fact, it may be inferred reasonably that appellant took steps to limit the publication of the dangers of Kaylo products. In 1952, before Saranac Laboratories published its final report on asbestos exposure from Kaylo products, it submitted to appellant a draft copy with the statement that in publishing the report "reference will be made only to hydrous calcium silicate and not to 'Kaylo' thus the interest of your company will be safeguarded. Of course, the final manuscript will be forwarded for your review before being released to the publisher." In the 1955 intra-company memorandum, previously mentioned, appellant referred to the published report of Saranac Laboratories with the statement, "The names 'Kaylo' and 'Owens–Illinois' appear nowhere in the article. It's completely anonymous."

In *Balbos*, 84 Md.App. 10, 578 A.2d 228, we reversed the jury's award of punitive damages against Owens–Illinois, Inc. based on a documentary record that differed by only

one document from that in the case *sub judice;*[5] however, *Balbos* is distinguishable from this case. First, the plaintiff employees in *Balbos* did not work with or in proximity to Kaylo products, but relied on the drift theory to demonstrate exposure. *Id.* at 75–79, 578 A.2d 228. This type of asbestos exposure was not tested directly by Saranac Laboratories. In the case *sub judice,* appellees worked with or near Kaylo products in enclosed rooms where clouds of dust were generated. This was similar to the test conditions in the Saranac Laboratory experiments. Second, the employees in *Balbos* did not contend that they were "exposed to levels of asbestos in excess of levels that were generally accepted as safe at the time." *Id.* at 77, 578 A.2d 228. In the case *sub judice,* appellees and their co-workers testified to exposures to Kaylo dust which were many times the accepted safe level. Based on the foregoing, and unlike *Balbos,* the appellants here demonstrated through direct evidence that Owens–Illinois had substantial knowledge of the dangers inherent in the use of their product and that, based on their failure to act on that knowledge, they were grossly indifferent to those dangers to the extent that their failure to act amounted to a wanton and reckless disregard for the plaintiffs. Therefore, we hold the evidence sufficient to sustain the court's denial of appellant's motion for judgment and the jury's award of punitive damages.

5.

*Whether the court erred when it failed to reduce Armstrong's compensatory damages award in accordance with the non-economic cap on damages in Md.Cts. & Jud.Proc.Code Ann. § 11–108 (1989).*

Section 11–108 provides in part:

(b) *Limitation on $350,000 established.*—In any action for damages for personal injury in which the cause of

action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

Owens–Illinois, Inc. maintains that because appellee Armstrong was first diagnosed with asbestosis in September 1987, his damage award was subject to § 11–108(b) and, therefore, the trial court should have reduced the award accordingly. We disagree.

In construing a statute, we attempt to effectuate the intent of the legislature. *Katz v. Wash. Sub. San. Comm.*, 284 Md. 503, 513, 397 A.2d 1027 (1979). We look first to the plain language of the statute for this is the legislature's final expression of its intended goal. *Morris v. Prince George's County*, 319 Md. 597, 603, 573 A.2d 1346 (1990). In doing so, "we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning in the absence of evidence to the contrary." *Brodsky v. Brodsky*, 319 Md. 92, 98, 570 A.2d 1235 (1990). At issue in the instant case is the meaning of the phrase "cause of action arises."

"A cause of action, in common legal parlance, is a state of facts which would entitle a person to sustain an action and to seek a judicial remedy on his behalf." *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 971 (5th Cir.1981); *see also Cope v. Anderson*, 331 U.S. 461, 466, 67 S.Ct. 1340, 1342, 91 L.Ed. 1602 (1947). According to Black's Law Dictionary, the word "arise" means "[t]o spring up, originate, to come into being or notice...." A cause of action in negligence requires evidence of each of the following: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, (3) an injury to the plaintiff, and (4) that the injury was proximately caused by the defendant's breach. *Pennwalt Corp. v. Nasios*, 314 Md. 433, 453, 550 A.2d 1155 (1988). A cause of action in strict liability requires evidence that (1) the plaintiff was injured, (2) the defendant's product caused the injury and (3) the defendant's product was defective. *Id.* at 453–54, 550 A.2d 1155. Thus, a "cause of action arises" in

negligence or strict liability when facts exist to support each element.

In the case *sub judice*, Owens–Illinois, Inc. contends that a cause of action does not arise until it is discovered. This contention is based on the "discovery rule" which provides that the statute of limitations will not begin to run until a plaintiff's cause of action accrues which is "when he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his injury." *Harig v. Johns–Manville Products*, 284 Md. 70, 83, 394 A.2d 299 (1978).[6] In essence, Owens–Illinois, Inc. argues that the word "arises" as used in § 11–108(b) has the same meaning as the term "accrues." We disagree.

In *Harig*, the Court of Appeals extended the discovery rule to "situations involving the latent development of disease." 284 Md. at 83, 394 A.2d 299. In doing so, the Court did not alter the moment at which the cause of action was deemed to have begun, but only delayed the running of the statute of limitations.

Like the victim of undiscoverable malpractice[,] a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was no notice of the existence of a cause of action. This feature distinguishes these situations from ordinary tort cases, which require no exception to the general rule that knowledge of the wrong is immaterial, because usually some harm will be apparent to a reasonably diligent plaintiff. In cases where the initial injury is inherently unknowable, however, the statute of limitations should not begin to

---

**6.** The "discovery rule" was developed to protect plaintiffs against whom a tort which is of "inherently unknowable character" has been committed from the harsh consequences of the general rule that the statute of limitations against a right or cause of action begins to run from the date of the alleged wrong. *Harig*, 284 Md. at 76–77, 394 A.2d 299.

run until the plaintiff should reasonably learn of the cause of action. Avoiding possible injustice in such cases outweighs the desire for repose and administrative expediency, which are the primary underpinnings of the limitations statute.

*Id.* at 80, 394 A.2d 299 (citations omitted). Based on the foregoing, a cause of action still arises when the facts exist to support each element, but does not accrue for purposes of the statute of limitations until it is discovered. Consequently, in the case *sub judice*, where the date of Armstrong's injury is at issue, § 11–108(b) is controlling only if Armstrong's asbestosis came into existence after July 1, 1986.

■■■■ Armstrong was diagnosed as having asbestosis in September 1987 based on a medical examination from the previous May. The evidence, even when viewed in the light most favorable to appellant, demonstrates that Armstrong must have had asbestosis prior to July 1, 1986. Appellant's medical expert, Dr. Steven Schonfeld, testified that asbestosis has a latency period of fifteen to twenty years. Armstrong's medical expert, Dr. Thomas Hobbins, put the latency period at twenty to thirty years. Both experts agreed that exposure to large doses of asbestos will result in a shorter latency period. It was also undisputed that asbestosis will continue to develop after one is no longer exposed to asbestos because asbestos fibers stay in the lungs forever and asbestosis progresses as long as there are asbestos fibers in the lungs.

Armstrong's exposure to asbestos began in 1942 and continued for at least twenty-one years until he left the Bethlehem Steel Shipyards in 1963. Armstrong was exposed to heavy doses of asbestos. He testified that he was often covered with Kaylo dust. Assuming the longest latency period of thirty years, July 1, 1986 was fourteen years more than required for asbestosis to develop under "normal" exposure.

Armstrong also complained that he has suffered from shortness of breath, a symptom of asbestosis, since the early 1980's. Armstrong was also a smoker for forty years, who quit in the mid–1970's. His shortness of breath was evidence that he had asbestosis beginning in the early 1980's, but his years of smoking make this far from conclusive.

The issue in the case *sub judice* was whether Armstrong had asbestosis. Armstrong's medical experts testified that he did, while appellant's medical experts testified that he did not. The jury must have believed Armstrong's medical experts. There was, and can be, no dispute that July 1, 1986 was well beyond the latency period of asbestosis for one exposed to asbestos in often heavy doses from at least 1942 to 1963. It is inconceivable that Armstrong's asbestosis came into existence between July 1, 1986 and his medical examination in May 1987. Armstrong's asbestosis must have developed prior to July 1, 1986. We hold that his damage award is not controlled by the cap on non-economic damages.

### 6.

*Whether the award of punitive damages violated appellant's right to due process of law by subjecting it to multiple punishments for the same wrong.*

Appellant contends that the punitive damage awards in the Armstrong and Wood cases violated its due process rights guaranteed by Article 24 of Maryland's Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution. Appellant maintains that it is being repeatedly punished for the same conduct because punitive damages were assessed against it in previous cases involving asbestos exposure from Kaylo products. We disagree and explain.

Appellant bases its contention on the assumption that the punitive damage awards in the case *sub judice* are for the same wrong as punitive damage awards in prior asbestos litigation. A similar contention was rejected by the Fifth

and Second Circuit Courts in *King v. Armstrong World Industries, Inc.*, 906 F.2d 1022 (5th Cir.1990) and *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir.1990), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990), because the evidence demonstrated that the punitive damage awards were only for the harm inflicted upon the specific plaintiffs in each case. Both federal courts found that the evidence in the prior asbestos cases reflected only the harm inflicted upon the plaintiffs in those suits and not the entire harm caused by the defendants' actions. The juries in those cases were instructed to return a punitive damage award which was appropriate only for the case before it. *King*, 906 F.2d at 1030; *Simpson*, 901 F.2d at 281. Similarly, in the cases before them on appeal, neither the evidence nor the jury instructions pertained to the totality of the defendants' misconduct. Rather, the cases involved only the acts of the defendants against the plaintiffs in their respective trials. In *Simpson*, the Court also determined that there was no evidence that the $375,000 in punitive damages assessed against Pittsburgh Corning Corp. in its two previous asbestos cases "was even close to whatever limit due process might impose on the total punitive damages that may be assessed against Pittsburgh Corning for its misconduct with respect to asbestos warnings." 901 F.2d at 281. Consequently, it affirmed the punitive damage award of $2,300,000 assessed against Pittsburgh Corning Corp. *Id.*

Similarly, in the case *sub judice,* the evidence and the jury instructions pertained only to the harm inflicted by the defendants upon the Woods, Armstrong and the other plaintiffs before it. The jury returned punitive damage awards in favor of the Woods and Armstrong for $1,000,000 dollars each. The evidence, jury instructions and the size of the punitive damage awards demonstrate that the punitive damage awards were neither for the totality of the harm caused by appellant's misconduct nor for any misconduct beyond this case. The evidence also demonstrates that previously Owens–Illinois has been subject to a total of $2,000,000 in

punitive damage awards. As Owens–Illinois is a defendant in over 68,000 asbestos cases, $2,000,000 does not appear to represent Owens–Illinois' complete punitive liability. Moreover, combined with the present award Owens–Illinois' total punitive damage liability, $4,000,000 to date, does not approach the limit due process might impose. The record before us does not demonstrate that Owens–Illinois is being punished repeatedly for a single misconduct and therefore, the punitive damage awards in the case *sub judice* did not violate its right to due process under either the Maryland Declaration of Rights or the Federal Constitution.

### 7.

*Whether the court erred when it did not off-set the jury awards for the Woods and Armstrong by the entire amount of the settlements with Owens–Corning Fiberglas.*

Owens–Corning Fiberglas settled with the Woods and Armstrong after the jury returned compensatory damages awards of $730,000 and $657,000, respectively. Armstrong settled for $304,166.33 of which $243,333.33 was designated as settlement of the compensatory damage award and $60,-833 was designated as settlement of the punitive damage claim. The $243,333.33 designated as the compensatory settlement equalled one-third of the total compensatory award. The Woods settled for $409,625 of which $328,500 was designated as settlement of the compensatory damage award and $82,125 was designated as settlement of the punitive damage claim. The $328,500 designated as the compensatory settlement equalled one-half of the total compensatory award. Two days after returning the awards for compensatory damage, the jury returned verdicts against Owens–Illinois for punitive damages of $1,000,000 in each case. After a post-trial hearing, the court, pursuant to the Uniform Contribution Among Tortfeasors Act, reduced the compensatory awards by the amount designated as the compensatory settlement. Appellant contends that the compensatory awards should have been reduced by the entire

settlement, which included the amounts designated as settlement of the punitive damage claims. We disagree and explain.

The Uniform Contribution Among Tortfeasors Act (UCATA), Md.Code Ann. art. 50, § 19 (1986), provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

■ In *Exxon Corp. v. Yarema*, 69 Md.App. 124, 134–38, 516 A.2d 990 (1986), we held that UCATA pertained only to compensatory damages and therefore a settlement by one joint tortfeasor would not reduce the punitive damage award against any others. UCATA was enacted to prevent a plaintiff from repeatedly collecting for the same injury caused by multiple defendants. As a result, the UCATA gives credit to a defendant for any payments made to a plaintiff that reduces the common liability. *Id.* at 136, 516 A.2d 990. Multiple tortfeasors are jointly and severally liable for the injuries suffered by the plaintiff and, thus, UCATA is clearly applicable to an aggregate compensatory award for these injuries. *Id.*

■ Punitive damages, on the other hand, are assessed against each defendant individually and are not held as a joint and several liability among joint tortfeasors. In *Yarema*, we stated:

In contrast, the award of punitive damages does not attempt to compensate the plaintiff for harm suffered by him but rather is exemplary in nature and is over and above any award of compensatory damages. The fundamental purpose of a punitive damage award is to punish the wrongdoer for misconduct and to deter future egregious conduct by others.

*Id.* (citations omitted). To accomplish this purpose, punitive damages are assessed against a defendant individually based on the degree of culpability or the existence of malice on the part of each defendant and thus are not held as a joint and several liability by joint tortfeasors. *Id.* at 137–38, 516 A.2d 990 (citations omitted).

Similarly, we hold that the settlement of a punitive damage claim by one joint tortfeasor will not reduce compensatory or punitive damage awards against the remaining joint tortfeasors. A compensatory award is a joint and several liability against all the joint tortfeasors while a punitive damage award is, and can only be, an individual liability. A settlement which involves both compensatory and punitive damages or claims pertains to two distinct liabilities and may, therefore, properly reflect both liabilities separately.

Owens–Illinois contends that to allow a plaintiff to apportion his or her settlement between compensatory and punitive damages invites abuse because it will permit a plaintiff to concoct a settlement with one defendant with a minimal compensatory amount and a maximum punitive settlement and thereby, minimize the compensatory set-off mandated by UCATA. While we agree that abuse may be theoretically possible, we do not find any *sub judice.* The compensatory settlement in both cases was at least three times the punitive damages settlement and it equalled the pro-rata share of Owens–Illinois' compensatory liability under UCATA. Moreover, the punitive damage settlement was less than one-tenth of the punitive damage award against Owens–Illinois. Therefore, it does not appear on the face of the settlement agreement that appellees gained anything through chicanery or abuse. Consequently, the court did not err when it reduced appellant's liability only by the amount of the compensatory settlement.

## II.

The appeal of Frederick and Alice Stormer is from a judgment in favor of Eagle–Picher Industries, Keane Corpo-

ration and Owens–Corning Fiberglas. The appeal of Dominic and Beatrice Celozzi is from a judgment in favor of ACandS, Inc., Armstrong World Industries, Celotex Corporation[7], Eagle–Picher Industries, Fiberboard Corporation, GAF Corporation, Owens–Corning Fiberglas and Owens–Illinois, Inc. Since the jury found that Frederick Stormer and Dominic Celozzi did not suffer from asbestosis, judgment was entered in favor of the defendants. The Stormers and the Celozzis filed motions for new trial which were denied.

## Issue Presented

Whether the court committed reversible error when it instructed the jury that damages could not be awarded solely for the medical condition of pleural plaques or pleural thickening.

## Facts

Frederick Stormer worked as a stockman for the Wallace and Gale Company for six months in 1942. As part of his job, Stormer sorted and stacked asbestos-containing pipe coverings. He then became a warehouseman for Lever Brothers where he worked near pipes covered with asbestos-containing insulation for twenty-eight years. Dominic Celozzi was employed as a coppersmith at the Bethlehem Sparrows Point shipyard from 1937 to 1975. As part of his job, Celozzi worked with and near asbestos-containing insulation products in the engine and boiler rooms of ships.

Stormer and Celozzi presented evidence that they developed pleural plaques and pleural thickening from exposure to asbestos. They also presented evidence that they suffered from asbestosis. As we stated, *supra,* asbestosis is a scarring of the lungs caused by asbestos fibers which results in shortness of breath and difficulty in breathing.

---

7. The proceedings in this appeal as they pertain to the Celotex Corporation have been stayed by its filing of a bankruptcy petition in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division.

Pleural plaques and pleural thickening result from the scarring of the pleura, the thin membrane that keeps the lungs contained and configured to the chest wall and diaphragm. When asbestos fibers are inhaled into the lungs, they may pierce through the smallest airways into the pleura. The fibers that reach the pleura cause a localized reaction which results in a deposit of scar tissue. When the scarring of the pleura is localized, it is known simply as a pleural plaque. When the scarring is widespread, it is referred to as pleural thickening.

All of the medical experts agreed that pleural plaques and pleural thickening are an alteration of an otherwise healthy pleura. They also agreed that pleural scarring does not constitute any loss or detriment. Appellants' two medical experts often used the word "injury" to describe pleural scarring, yet they testified that pleural plaques and pleural thickening do not affect the human body, do not shorten life expectancy, do not cause complications or problems, do not cause pain and cannot be felt. Appellees' three medical experts testified that pleural plaques and pleural thickening have no health significance and do not cause any pain, dysfunction, symptoms or problems.

Based upon this evidence, the court instructed the jury as follows:

> You have heard testimony that one or more of these plaintiffs may have developed pleural plaques or pleural thickening as a result of exposure to asbestos. You are instructed that there is no evidence that pleural plaques or pleural thickening cause any impairment or disability. If you find that a plaintiff has only pleural plaques and/or pleural thickening and not asbestosis, then your answer to question one [on the verdict sheet] should be no as to that plaintiff. No damages may be awarded solely because of the pleural plaques or pleural thickening.

Question one on the verdict sheet instructed the jury that if they found that either Stormer or Celozzi did not have asbestosis they should not proceed any further in their deliberation of that case. The jury determined that neither

Stormer nor Celozzi suffered from asbestosis and judgment was entered in favor of the defendants.

## Discussion

A party may have its theory presented to the jury only if it is a correct exposition of the law and there is evidence to support its theory. *Myers v. Alessi,* 80 Md.App. 124, 130–31, 560 A.2d 59 (1989). To have a cause of action based on claims of product liability or negligence law submitted to the jury, the plaintiff must produce evidence of a legally compensable injury. *Wright v. Eagle–Picher Industries,* 80 Md.App. 606, 615, 565 A.2d 377 (1989); Md. Rule 2–519. In the case *sub judice,* the evidence produced by Stormer and Celozzi demonstrated that pleural plaques and pleural thickening alter the pleura, but do not cause any loss or detriment. Consequently, the court's instruction on pleural plaques and pleural thickening was error only if mere alteration of the pleura is a legally compensable injury. We hold that it is not.

Sections 388 and 402A of The Restatement (Second) of Torts (1965) identify "harm" as one of the necessary elements of a cause of action in both negligence and strict liability. The Restatement, in Section 7(2), defines "[t]he word 'harm' [as] used throughout the Restatement ... to denote the existence of loss or detriment in fact of any kind to a person resulting from a cause." Comment b to section 7 further explains that " '[h]arm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing.... In so far as physical changes have a detrimental effect on a person, that person suffers harm." These definitions, as used in the Restatement (Second) of Torts, have been cited with approval in Maryland. *See Phipps v. Gen. Motors Co.,* 278 Md. 337, 340–41, 363 A.2d 955 (1986) (adopting § 402A); *Twombley v. Fuller Brush Co.,* 221 Md. 476, 492, 158 A.2d 110 (1960) (adopting § 388); *Hearst Corp. v. Hughes,* 297 Md. 112, 118, 466 A.2d 486 (1983) (discussing § 7).

Stormer and Celozzi contend that their pleural scarrings are nonconsented alterations of their bodies and as such are grounds for compensation. In support of their contention, they cite the Restatement (Second) of Torts § 15, comment a (1965) which discusses the topic of "battery" and provides, "There is an impairment of the physical condition of another's body if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm." This is, however, only a partial quote from comment a which continues, "A contact which causes no bodily harm may be actionable as a violation of the right to freedom from the *intentional* infliction of offensive bodily contact." (Emphasis added). Section 15 is inapposite, therefore, because it broadly defines bodily harm only in the context of an action based on the intentional tort of battery. A similar argument was rejected in *Wright v. Eagle–Picher,* 80 Md.App. 606, 615, 565 A.2d 377 (1989). *See also In re Hawaii Federal Asbestos Cases,* 734 F.Supp. 1563, 1567 (D.Haw.1990) ("Plaintiffs must show a compensable harm by adducing objective testimony of a *functional impairment* due to asbestos exposure.... In other words, the mere presence of asbestos fibers, pleural thickening or pleural plaques in the lung unaccompanied by an objectively verifiable functionable impairment is not enough." (Emphasis in original) (footnote omitted)).

█ In Maryland, compensatory damages are not to be awarded in negligence or strict liability actions absent evidence that the plaintiff suffered a loss or detriment. In the case *sub judice,* the medical evidence was clear and uncontradicted that pleural scarring does not cause a functional impairment or harm as defined in the *Restatement* § 7, *supra.* Consequently, the court did not err when it instructed the jury that damages were not to be awarded merely for pleural plaques or pleural thickening.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.