573 A.2d 847

**ANNE ARUNDEL COUNTY FISH & GAME CONSERVATION ASSOCIATION, INC.**

v.

**Robert CARLUCCI, et al.**

**No. 1354 Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 30, 1990.

T. Joseph Touhey, Glen Burnie, for appellant.

Michael P. Darrow, Annapolis, for appellees.

Argued before GARRITY, KARWACKI and CATHELL, JJ.

KARWACKI, Judge.

This case concerns noise resulting from gunfire on the premises of the Anne Arundel County Fish and Game Conservation Association, Inc. (the Club), the appellant. The issue is whether that noise constituted a common law private nuisance to resident owners of properties adjoining the Club, the appellees. The Circuit Court for Anne Arundel County concluded that it did and issued an injunction requiring the Club to design and implement a noise abatement system for all of its facilities. This appeal ensued.

### The Facts

The Club is located on 39 acres of land off St. Margaret's Road at the head waters of Mill Creek near Annapolis in Anne Arundel County. Since the Club purchased the property in the early 1950's, it has operated facilities there for trap and skeet shooting as well as rifle and pistol target ranges. The Club has over 300 members.

When the Club purchased its property, there was relatively little residential development in the area. In recent years, however, that has changed. The real estate surrounding the Club's premises is now predominantly improved by residences.

Several of the appellees described the noise emanating from the Club's activities. Michael Darrow testified that in 1987 he completed the home which he shares with his wife, four-year-old son, and infant daughter. He purchased the

five acres of land on which it is built in 1985 or 1986. His house is located approximately 800 feet from the boundary line between his property and the Club's land. Darrow related that the gunfire from the Club occurred from 9:00 a.m. until 9:00 p.m. seven days a week, but that it varied rather significantly. On Wednesday and Friday evenings and all day Saturday and Sunday the gunfire noise was intense. On Mondays it was less annoying, and the quietest days were Tuesdays and Thursdays. He noted that he could hear the gun club's activities from any place in his house, including the shower with the water running. Furthermore, he could even hear the shooting when his windows were closed. He testified that he and his family could not use their yard on the weekends because of the excessive noise. The noise frightened his son, and it prevents sleeping, reading, watching television or any other activity which requires concentration. He said that the number of shots could range from 10,000 to 30,000 per day.

Dwayne Lynn Thomas, another appellee, testified that he resides on land adjoining the Club premises which he purchased in 1979. He built a house on the property, and he and his wife occupied their new home in 1987. He stated that he heard gunfire from appellant's property on Wednesday and Friday nights, all day on Saturdays and Sundays, and occasionally on Mondays, Tuesdays and Thursdays. He testified that when there is shooting at night he cannot go to sleep until after 10:00 p.m., and on weekends he and his wife cannot sleep late in the morning because of the noise. They are unable to use their yard or the patio because of the loud gunfire. Another appellee, William Hartman, whose house is located approximately 800 feet from the boundary of the Club property, said that he too was unable to use his yard or the deck of his home because of the noise. He further testified that the gunfire could be heard within his house even when the windows and doors are closed. A.B. Bowers, an appellee, testified that he had lived across St. Margaret's Road from the Club for 21 years. Bowers has related that the gunfire from the Club required him to

turn up the volume on his television "extra loud" simply to understand what was being said. Further, he testified that in the summer his wife has to wear earplugs when she is outside their home.

Five other appellees similarly testified to the incessant gunfire at the Club and to the interference that the noise caused with enjoyment of their residences. Appellant produced no witnesses who live within the vicinity of the Club and who felt that the noise from the Club's activities was not a material annoyance. All of the appellees also related the efforts which they had made to persuade the representatives of the Club to modify its gunfire activities. Their complaints to the police also had not resulted in any relief.

In seeking reversal of the judgment of the trial court, appellant contends:

I. Appellant Gun Club's Activities are Exempt from State Noise Regulations as a "Sporting Event."

II. The Court Erred in Adopting the Results of "Fast" Mode Testing of Noise Levels from the Gun Club Premises.

III. The Court Erred in Determining that a Private Nuisance Existed.

IV. The Restrictions Imposed by the Court Were not Reasonably Related to the Evidence.

### I.

Appellant argues that, since it is not subject to the noise restrictions imposed by regulations adopted by the Department of the Environment, its activities cannot be enjoined as a private nuisance. We disagree.

We observe, initially, that there is a question, which we need not resolve in the instant case, as to whether a gun club such as appellant is exempted from the regulations in question. Under Environment Code Ann., Title 3, the Department of Environment has been charged with promulgating regulations which limit noise. That department is also authorized to enforce its regulations by instituting an action

against anyone who willfully violates the noise control limitations to enjoin the violations, Environment Code Ann., § 3–405, or to seek the civil penalty provided by Environment Code Ann., § 3–406. Significantly, the General Assembly has exempted shooting sports clubs from the reach of noise regulations in some counties of the State; however, Anne Arundel County is expressly excluded from that exemption. Environment Code Ann., § 3–401(c)(5).[1]

The regulations adopted by the department to control noise pollution are codified in COMAR 26.02.03.01 through .05. The maximum allowable noise levels affecting land, measured at its boundary, are set forth at COMAR 26.02.03.03 § A(1):

TABLE 2
Maximum Allowable Noise Levels (dBA)
for Receiving Land Use Categories

| Effective Date | Day/Night | Industrial | Commercial | Residential |
|---|---|---|---|---|
| Upon Adoption | Day | 75 | 67 | 65 |
| | Night | 75 | 62 | 55 [2] |

That regulation further provides:

(3) A person may not cause or permit the emission of prominent discrete tones and periodic noises which exceed

---

**1.** Section 3–401(c)(5) provides:

(i) The sound level limits and noise control rules and regulations adopted under this subsection may not prohibit trapshooting, skeetshooting, or other target shooting between the hours of 9 a.m. and 10 p.m. on any range or other property of a shooting sports club that is chartered and in operation as of July 1, 1983. However, this prohibition does not apply if the sports shooting club moves to a parcel of land that is not contiguous to the location of the club on July 1, 1983.

(ii) This paragraph does not apply in Allegany, Anne Arundel, Baltimore City, Calvert, Charles, Garrett, Howard, Montgomery, St. Mary's, and Washington counties.

**2.** Terms used in the regulations are defined at COMAR 26.02.03.01:

a level which is 5 dBA lower than the applicable level listed in Table 2.

Exempted from application of the regulation is:

(j) Sound not electronically amplified created by sporting, amusement, and entertainment events and other public gatherings operating according to terms and conditions of the appropriate local jurisdictional body. This includes but is not limited to athletic contests, amusement parks, carnivals, fairgrounds, sanctioned auto racing facilities, parades, and public celebrations. This exemption only applies between the hours of 7 a.m. and 12 midnight.

Even assuming that appellant qualifies for an exemption under this regulation because its activities constitute "sporting, amusement, and entertainment events," however, this exemption would not bar appellees, who reside in a residential district, from seeking equitable relief from a nuisance created by appellant. *Meadowbrook Swimming Club, Inc. v. Albert*, 173 Md. 641, 645, 197 A. 146 (1938). *See also* 58 Am.Jur.2d *Nuisances* § 467 (1989).

## II.

Appellant's next contention involves the expert testimony produced by both appellant and appellees as to the measurement of the noise received from appellant's activities at certain of the appellees' properties.

There are three different modes which can be used for taking sound measurements with a sound level meter: fast, impulse, and slow. The fast mode reports sound levels five

---

D. 'dBA' means abbreviation for the sound level in decibels determined by the A-weighting network of a sound level meter or by calculation from octave band or one-third octave band data.

E. 'Daytime hours' means 7 a.m. to 10 p.m., local time.

F. 'Decibel (dB)' means a unit of measure equal to ten times the logarithm to the base ten of the ratio of a particular sound pressure squared to a standard reference pressure squared. For the purpose of this subtitle, 20 micropascals shall be the standard reference pressure.

M. 'Nighttime hours' means 10 p.m. to 7 a.m., local time.

P. 'Periodic noise' means noise possessing a repetitive on-and-off characteristic.

decibels higher than the slow mode. The impulse mode produces readings somewhere in between. Appellees' expert, George Spano (Spano), testified that he had made his measurements on three separate occasions over a period of four months on certain of the appellees' properties using the fast mode. Explaining his decision to use fast mode, Spano testified that gunfire noise is a "periodic" noise, a noise which has a rapid repetitive on-and-off characteristic. If he had used slow mode, he explained, he would have averaged part of the sound which is not pertinent when measuring noise from gunfire. Spano pointed out that the slow mode of measurement employed by appellant's expert in effect averaged the sound for the entire period during which the sound level measurements were taken, lowering the actual peak sound from any individual gunfire shot. Using the fast mode, by contrast, gives a measurement of the gunfire noise without adding in some of the lower ambient noise, and thus, it would not dilute the maximum level as the slow mode would. Fast mode averages the sound over $\frac{1}{8}$ of a second; slow mode averages in all of the ambient background noise over one second. Furthermore, fast mode is better than the slow mode in more closely duplicating the receiving qualities of the human ear.

According to Spano's measurements, the Club's daytime activities were at levels higher than the 65 decibel limit set by noise regulations of the Department of the Environment. Prior to and after taking each measurement, Spano calibrated his equipment in accord with precision measurement procedure. While the sound level meter itself had not been returned to the factory for calibration, the calibrator which Spano employed had been so checked within a year before these particular tests. Further, Spano admitted that his readings were not from a machine printout at the time of measurement, but were based on his observations of a fluctuating needle on the sound meter.

Appellant's expert, Richard C. Whiting (Whiting), testified that his measurements, taken on two occasions by slow mode testing, produced levels which were in several cases in

excess of 65 dBA which "causes concern." He acknowledged that the Club would want to get the daytime noise level down below 65. Further, he admitted that Spano had attempted to find out what the maximum decibel levels were at any given point compared to his own attempt to average the sound out over a period of time and that the Maryland regulations referred to maximum noise levels. To measure the highest or maximum sound level he conceded that the best method to use is fast mode testing. Whiting felt that the ambient background noise at both sites was extremely high; he noted that there were cicadas in the trees, passing planes, and other neighborhood activities. Spano acknowledged that the ambient background noise must be 10 dBA lower than the noise being measured if the test results are to be unaffected by the background noise; he stated, however, that he had ensured that the background noise was at least 10 dBA lower than the gunfire. Whiting argued that the weather, wind velocity and the direction of the sound are important factors in test results, criticizing Spano for not considering them. In giving his test results, however, Whiting never accounted for the direction of the sound he was measuring.

During cross-examination, Whiting acknowledged that the slow mode testing procedures promulgated by the Federal Environmental Protection Agency were designed for industrial cases, not gunfire cases which involve periodic sound. Further, he conceded that the actual maximum limits for periodic sound, such as gunfire, is limited to 60 dBA during the day and 50 dBA at night. When asked what the maximum sound levels were during his testing, he stated that the sound level reached 78.2 dBA even when using the slow mode. Further, he acknowledged that by using the averaging method, an 80 dBA sound could be reduced through averaging to a sound that was less than 65 dBA depending on the number of shots at any given time. Whiting acknowledged also that he had not done his testing at the property lines of the respective properties, which would have been much closer to the sound source, but had

conducted the tests further away from the sound source. He admitted that the officers of the Club were fully aware of the testing and that the Club knew before the testing when the testing was going to take place. Finally, he recognized that the Environment Code Ann. and the regulations promulgated by the Department of the Environment are silent as to the particular method to be used in measuring sound levels.

Considering the different testing modes, the court noted that the regulations in question do not specify which type of testing is to be used. The court concluded that the fast mode was appropriate for testing, adopting appellees' expert's results, even though the court acknowledged that the fast mode would produce higher readings.

■ Appellant argues that the court erred in applying State noise regulations to the Club and in adopting the results of fast mode testing of noise levels from the Club's activities. We disagree. Spano testified about the dBA levels and how those levels related to the existing statutory regulations solely so that the court could have some empirical standard by which to measure the sound levels emanating from the gun Club. The court recognized that the COMAR guidelines were only offered so that the court would have some standard which it could use in framing its order:

> In order to provide quantifiable guidelines for the operation of the gun club, the Court will adopt some standards provided by COMAR. The application of the COMAR regulations should not be read as an adoption of these regulations as applied to this case; the COMAR regulations are simply used for the advisory benefit they provide.

We perceive no error in the court's use of Spano's measurements of the noise levels using the fast mode of testing.

## III.

■ Appellant asserts that the court was clearly erroneous in concluding that the noise generated by the Club

constituted an actionable private nuisance. The applicable law refutes its contention.

In *Meadowbrook Swimming Club Inc. v. Albert, supra,* 173 Md. at 645–47, 197 A. 146 the Court of Appeals affirmed an order of the trial court enjoining Meadowbrook from engaging an orchestra to play on an outdoor dance floor, creating loud music which disturbed the residents of the neighborhood. The Court adopted, in part, the trial court's opinion which is apposite to the instant case:

'The law is clear that where a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a neighboring owner for which an action lies at law or equity. In such cases it makes no difference that the business was lawful and one useful to the public and conducted in the most approved method. *Susquehanna Fertilizer Co. v. Malone,* 73 Md. 268, 20 A. 900 [1890]; *Scott v. Bay,* 3 Md. 431 [1853]; *Lurssen v. Lloyd,* 76 Md. 360, 25 A. 294 [1892]; *Northern Cent. Ry Co. v. Oldenburg & Kelley,* 122 Md. 236, 89 A. 601 [1914]. *Jackson v. Electro Products Co.,* 132 Md. 128, 103 A. 453 [1918].

'The rule which must control is whether the nuisance complained of will or does produce such a condition of things as in the judgment of reasonable men is naturally productive of actual physical discomfort to persons of ordinary sensibilities, tastes, and habits, such as in view of the circumstances of the case is unreasonable and in derogation of the rights of the party (*Hamilton Corp. v. Julian,* 130 Md. 597, 101 A. 558 [1917]; *Woodyear v. Schaefer,* 57 Md. 1, 12 [1881]) subject to the qualification that it is not every inconvenience that will call forth the restraining power of a court. The injury must be of such a character as to diminish materially the value of the property as a dwelling and seriously interfere with the ordinary comfort and enjoyment of it. *Adams v. Michael,* 38 Md. 123 [1873]; *Gallagher v. Flury,* 99 Md. 181, 182, 57 A. 672 [1904]; *Euler v. Sullivan,* 75 Md. 616, 618, 23 A. 845 [1892].

'It can scarcely be argued that any habitual noise whether produced by skilled musicians led by the frank and cultivated leaders who testified as here, or by domestic animals, as in *Singer v. James*, 130 Md. 382, 100 A. 642 [1917]) which is so loud, continuous, insistent, not inherent to the character of the neighborhood, and unusual therein, that normal men, women, and children, when occupying their own homes, however distant, are so seriously incommoded that they cannot sleep, study, read, converse, or concentrate until it stops, is not an unreasonable, unlawful, invasion of their rights....'

█ There was ample evidence to justify the court's conclusion that the gunfire on appellant's premises, which according to one of the appellees, a retired captain in the U.S. Navy, produced noise akin to a small arms fire fight, constituted a private nuisance to its residential neighbors. Further, the fact that most of the appellees purchased their properties and built their homes on residentially zoned property after appellant had established its gun club did not bar those appellees from seeking equitable relief from the nuisance. *Longley v. McGeoch*, 115 Md. 182, 189, 80 A. 843 (1911).

## IV.

█ Finally, the appellant argues that the injunction issued by the court was overbroad. We again disagree.

The court ordered that within six months the appellant design and implement a noise abatement system for all of its facilities so as to reduce the noise to not more than 65 dBA during the daytime and 55 dBA during the nighttime. It further provided that the sound would be measured by devices using the fast mode setting at locations on the appellees' properties from 10 to 30 feet from the sides of appellees' houses which faced appellant's premises. It further ordered that during the six month period appellant's firing ranges not be operated before 10:00 a.m. or after 5:30 p.m. on Mondays, Tuesdays, and Thursdays; before 10:00

■                              **133**

a.m. or after 9:30 p.m. on Wednesdays and Fridays; and before 10:00 a.m. or after 1:30 p.m. on Saturdays and Sundays. (The court permitted the ranges to be operated after 1:30 p.m. on Saturdays and Sundays for six matches sanctioned by various gun associations during the six month period.) The court retained jurisdiction for the purpose of evaluating compliance with the injunction.

Both experts who evaluated the noise emanating from the Club testified that there are effective noise abatement procedures which could be employed by appellant to reduce the noise levels which appellees were enduring on their properties. We perceive no abuse of the court's discretion in so framing the injunction which would effectively relieve the appellees from the nuisance which the court found appellant had created. *Cf. Meadowbrook Swimming Club Inc. v. Albert, supra,* 173 Md. at 647–49, 197 A. 146.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY APPELLANT.