602 A.2d 239

CAE-LINK CORPORATION, et al.,

v.

WASHINGTON SUBURBAN SANITARY COMMISSION.

No. 849, Sept. Term, 1991.

Court of Special Appeals of Maryland.

March 2, 1992.

606

David H. Bamberger, Baltimore, and John E. Prominski, Jr., Fairfax, Va. (Joanne L. Cronrath and Piper and Marbury, Baltimore, on the brief), for appellants.

Richard J. Magid and William F. Ryan (Whiteford, Taylor & Preston on the brief, Baltimore of counsel: Nathan J. Greenbaum, Gen. Counsel, and Robert H. Drummer, Associate Gen. Counsel for WSSC on the brief), Hyattsville, for appellee.

Argued before GARRITY, BLOOM and CATHELL, JJ.

CATHELL, Judge.

The Washington Suburban Sanitary Commission (WSSC) commenced this declaratory judgment action eleven years

ago against various specified property owners in the Montgomery Industrial Park (MIP),[1] as well as other persons claiming injury as a result of WSSC's taking of certain covenants running with the land. The MIP owners who are present parties to the case are CAE–Link Corporation, BancTec Systems, Inc., AT & T Resource Management Corporation, International Fabricare Institute, Erie Indemnity Company and the Washington Post Company. Additionally, John and Norma Robertson and Jerry and Barbara Robertson are also appellants. All of the appellants are represented by the same attorneys on appeal and all issues and arguments here raised by counsel are made on behalf of all appellants. Except when otherwise necessary, we shall refer to all of the owners as appellants.

On July 10, 1978, the United States District Court for the District of Columbia issued a comprehensive order, pursuant to the Federal Water Pollution Control Act, which required WSSC to build and have operational by July 1, 1979, a sewage sludge composting facility in Montgomery County, Maryland.[2]

On April 25, 1980, the district court issued a second order compelling WSSC to move forward with the construction and operation of a sewage sludge composting facility to be

---

1. On motions prior to and during trial, WSSC asked the court to dismiss the inverse condemnation claims of those Appellants who took title to their land in the MIP after WSSC's July 8, 1980, condemnation date. Computer Entry Systems Corp. (now known as BancTec Systems, Inc.), Singer Company (now known as CAE–Link Corporation) and AT & T took title to their land after that date. The trial court denied WSSC's motions for judgment as to these "subsequent takers" and permitted the jury to consider inverse condemnation claims based on covenant rights which were extinguished on July 8, 1980.

2. This order was the result of a suit by the United States to rectify an environmental crisis caused by the inadequate methods of disposal of sewage sludge generated by the Blue Plains Sewage Treatment Plant. Because the Blue Plains Plant provided sewage treatment for several Washington Metropolitan jurisdictions, including Montgomery and Prince George's counties, WSSC, as the bi-county commission of the State of Maryland responsible for the water and sewage service for both counties, was named as a defendant in that suit.

located at the specified site in the MIP, known as "Site II". On June 27, the district court issued a third order reiterating the directives set forth in its prior orders. In this order, the district court overrode and enjoined WSSC from complying with an injunction issued by the Circuit Court for Prince George's County which prohibited WSSC from expending any funds to build or operate Site II. The federal judge also ordered WSSC to proceed expeditiously to obtain the land, build, and operate the composting project. Finally, the judge enjoined all parties from taking any action which would frustrate or impede the execution of the order.

Pursuant to the district court's order, WSSC filed a condemnation action in the Circuit Court for Montgomery County to obtain the land for the Site II composting project. WSSC condemned 115 acres in the MIP for the construction and operation of a sewage sludge composting facility. The land WSSC took by condemnation was burdened by certain restrictive covenants in favor of neighboring land owners in the MIP. Thus, WSSC initiated a declaratory judgment action to determine whether the beneficiaries of the covenants had to be compensated for the value of those property rights. The defendants answered WSSC's complaint and filed counterclaims for monetary damages alleging inverse condemnation, breach of covenant, nuisance, bad faith pursuant to Maryland Rule 1–341 and violation of 42 U.S.C. section 1983.

On motion of the defendants, the trial court issued a ruling that the restrictive covenants owned by the defendants and extinguished by WSSC's condemnation were compensable property interests and denied WSSC's claim for declaratory relief. WSSC appealed to this Court, which affirmed the lower court's ruling. *WSSC v. Frankel,* 57 Md.App. 419, 470 A.2d 813 (1984). The Court of Appeals subsequently vacated and remanded the case for further proceedings in the circuit court. *WSSC v. Frankel,* 302 Md. 301, 487 A.2d 651 (1985).

WSSC moved for partial summary judgment. The trial court granted WSSC's motion as to the counterclaims that

alleged violation of § 1983, bad faith, and punitive damages. The court denied WSSC's motion as to the counterclaims for inverse condemnation and breach of covenants. As to the nuisance claim, the court granted partial summary judgment to the extent of requiring that the defendants prove that WSSC was negligent. The counterclaims for breach of covenant were nevertheless dismissed by stipulation of the parties that the covenants had been extinguished in July of 1980 as a result of the WSSC's condemnation of Site II.

Trial by jury on the nuisance and inverse condemnation counts began on March 4, 1991. At the close of the counterclaimants' case-in-chief, WSSC moved for judgment on both counts. The trial court denied WSSC's motion as to inverse condemnation, but granted the motion on the nuisance count. At the conclusion of all the evidence, the jury found in favor of WSSC.[3] Counterclaimants' motion for new trial was denied and this appeal ensued.

On appeal, Appellants present the following assignments of error:

I. The trial court committed reversible error in granting WSSC's Motion For Judgment on Appellants' claims for nuisance.

A. The trial court committed reversible error in ruling that proof of negligence was a prerequisite to recovery on Appellants' nuisance claim.

B. The trial court erred in equating the standard of proof necessary to establish a non-possessory taking with the standard of proof necessary to establish a nuisance.

II. The trial court committed reversible error in instructing the jury that, in determining the value of the restrictive covenants, they could consider whether

---

**3.** The jury did not "find by the preponderance of the evidence that the covenants extinguished on July 8, 1980 added measurable value to the land in the Montgomery Industrial Park owned by" each of the defendants.

WSSC's use of Site 2 substantially interfered with Appellants' use and enjoyment of their lands.

III. The trial court committed reversible error in admitting evidence of unforeseeable "comparable" sales that occurred long after the date of taking.

IV. The trial court committed reversible error in admitting prejudicial evidence that certain Appellants had knowledge when they purchased their lands that WSSC proposed to build a sludge facility.

V. The trial court's erroneous and inconsistent evidentiary rulings created jury confusion and warrant reversal.

A. WSSC's internal memoranda on the issue of the value of the restrictive covenants should have been admitted.

B. The trial court committed reversible error by allowing the jury to visit Site 2 at the close of all the evidence.

C. The trial court's double standard for admissibility of evidence "inside" and "outside" MIP prevented the jury from having an accurate picture of the effect of Site 2 on Appellants' properties.

D. The trial court's admission of hearsay appraisals was erroneous and prejudicial.

E. The trial court erred by admitting WSSC's "state-of-the-art" evidence.

F. The trial court erred in refusing to allow Appellants to cross-examine WSSC's expert fully with regard to his credibility.

Appellee cross appeals, raising three issues:

I. The trial court erred by permitting the jury to consider the inverse condemnation claims of those Appellants who purchased their land after the restrictive covenants were extinguished on July 8, 1980.

II. The trial court erred by refusing to strike the speculative valuation testimony of Appellants' expert witness, E.L. Dieudonne.

III.   The trial court erred by refusing to grant WSSC's motion for judgment against AT & T on the ground that its inverse condemnation claim was barred by limitations.

## DISCUSSION

### I.   THE TRIAL COURT ERRED BY GRANTING WSSC'S MOTION FOR JUDGMENT AS TO APPELLANTS' NUISANCE CLAIMS.

In granting judgment in favor of WSSC on the nuisance claims, the trial court said:

> With respect to the nuisance claim, the motion to dismiss is granted for two reasons.  The first reason being that right or wrong I have held that in this case, based upon the facts in this case, that in order to recover on a nuisance theory, the Plaintiffs have to show simple negligence in the construction and operation of the facility. There is no evidence that I can recall to support that theory.

Appellee argues that the principal issue on this appeal is whether, as a matter of law, it can be held strictly liable in nuisance for complying with the injunctive orders of a federal district court which specifically required it to build and operate a sewage sludge composting facility at a specified location near Appellants' properties.  Appellee contends that federal law (Federal Water Pollution Control Act) preempts the state law of nuisance and an award of damages would constitute an "attack" on the orders of the district court.  Appellants rebut Appellee's preemption argument, asserting that an award of damages, unlike injunctive relief, would not interfere with the operation of Site II and that a nuisance cannot be created with impunity pursuant to legislative or judicial authority.

### A.   PREEMPTION

The Supremacy Clause of the United States Constitution, art. VI, cl. 2, requires that when compliance with

both federal and state law is a physical impossibility, the "state law is 'void to the extent it conflicts with a federal statute.'" *Sanders v. State,* 57 Md.App. 156, 167, 469 A.2d 476 *cert. denied,* 299 Md. 656, 474 A.2d 1345 (1984) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981)). *See also Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Harrison v. Schwartz,* 319 Md. 360, 364, 572 A.2d 528, *cert. denied,* —— U.S. ——, 111 S.Ct. 143, 112 L.Ed.2d 110 (1990); *Hecht Co. v. C & P Telephone Co.,* 310 Md. 148, 152, 528 A.2d 474 (1987). If Congress has expressly stated preemptive intent or evidenced an intent to occupy a field, federal law shall govern. *Harrison,* 319 Md. at 364, 572 A.2d 528. When, however, Congress does not expressly state its intent, there is a presumption against preemption. *Abbot by Abbot v. American Cyanamid Co.,* 844 F.2d 1108, 1112 (4th Cir.1988) (citing *Maryland v. Louisiana,* 451 U.S. at 726, 101 S.Ct. at 2118). The presumption is even stronger against preemption of state remedies, like tort recoveries, when no federal remedy exists. *Abbot,* 844 F.2d at 1112 (citing *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 622, 78 L.Ed.2d 443 (1984)). *See also Taylor v. Gen. Motors Corp.,* 875 F.2d 816 (11th Cir.), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1991) (strong presumption against preemption when subject matter is tort remedy).

██ The federal district court passed its order pursuant to 33 U.S.C. § 1251 *et seq.,* the Federal Water Pollution Control Act or the Clean Water Act (1987). Section 1251(a)(5) provides that "it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State...." Section 1365(e), known as "the saving clause," provides that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common

law to seek enforcement of any effluent standard or limitation or *to seek any other relief....*" (Emphasis added.)

The paradigmatic decision in this area is *International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). In *Ouellette,* Vermont landowners brought suit against an operator of a New York pulp and paper mill, under the Vermont common law of nuisance. The Supreme Court held that the Clean Water Act preempted Vermont nuisance law to the extent that that law sought to impose liability on an out-of-state point source[4] because that "would be a serious interference with the achievement of the 'full purposes and objectives of Congress.'" *Ouellette,* 479 U.S. at 493–94, 107 S.Ct. at 812 (citation omitted). The Act did not, however, bar landowners from bringing a nuisance claim pursuant to the law of the source state, which in that case was New York. *Id.* at 497–99, 107 S.Ct. at 814–15. The Court stated that "[t]he saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State." 479 U.S. at 497, 107 S.Ct. at 814 (emphasis in original). *But see City of Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (the Water Pollution Control Act saving clause does not bespeak a congressional intent to preserve *federal* common law remedies inconsistent with the complex statutory scheme provided by that Act). *Accord Nat'l Audubon Soc'y v. Dep't of Water,* 869 F.2d 1196 (1988) (*federal* common law nuisance claims are preempted by Federal Water Pollution Control Act).

Appellee relies on the case of *Bieneman v. City of Chicago,* 864 F.2d 463 (7th Cir.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661 (1989). This reliance is misplaced. The *Bieneman* Court held that all state common law remedies *were not* preempted. *Id.* at 473.

---

4. "A 'point source' is defined by the CWA as 'any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged.'" 479 U.S. at 485 n. 4, 107 S.Ct. at 808 n. 4.

Appellee finds significant the Court's holding that "[a] state court could not award damages against O'Hare or its users for conduct required by these regulations...." *Id.* at 472. In the case *sub judice*, the federal district court ordered WSSC to build and operate a composting site in the MIP. It did not, however, order Appellee to build and operate a composting site that emits obnoxious odors that invade the property of others. Therefore, WSSC's conduct was not entirely directed by the district court order and state actions are not precluded. Thus, because of the saving clause, the Water Pollution Control Act would not bar Appellants from maintaining their nuisance suit in this state nor is the nuisance action otherwise preempted by federal law.

### B. NUISANCE CLAIM

■ Appellants argue that the trial court erred by requiring them to prove negligence as a prerequisite to recovery on their nuisance claim. They specifically argue that in Maryland nuisance is a matter of strict liability and that negligence is not a necessary element; thus, the trial court's ruling directly contradicts established law in this state. Appellee refutes this argument, contending that it should not be held strictly liable for doing what it was ordered to do and cites numerous cases from other jurisdictions that require a showing of negligence in order to establish nuisance. Appellee advises us to carve out an exception based on the unusual facts of this case. We decline.

The Court of Appeals, in *Meadowbrook Swimming Club, Inc. v. Albert*, 173 Md. 641, 645, 197 A. 146 (1938), said:

The law is clear that where a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a neighboring owner for which an action lies at law or equity. In such cases it makes no difference that the business was lawful and one useful to the public and conducted in the most approved method. [Citations omitted.]

*See also Bishop Processing Co. v. Davis,* 213 Md. 465, 474, 132 A.2d 445 (1957); *Gorman v. Sabo,* 210 Md. 155, 159, 122 A.2d 475 (1956); *Anne Arundel Fish & Game Conservation Ass'n, Inc. v. Carlucci,* 83 Md.App. 121, 131, 573 A.2d 847, *cert. denied,* 320 Md. 800, 580 A.2d 218 (1990). The Court of Appeals held in *Taylor v. Mayor and City Council of Baltimore,* 130 Md. 133, 99 A. 900 (1917), that the City of Baltimore could be liable for nuisance even though it constructed a sewage treatment plant under the authority of state law. The Court, discussing nuisance, posed the question: "Is it to be said that a municipal corporation can thus interfere with the rights of others and injure their property without being liable in damages, merely because it, in constructing its work, is acting under legislative authority?" *Taylor,* 130 Md. at 140, 99 A. 900. The Court answered, "The Legislature has no power to grant such rights to any corporation, public or private." *Id.* See also *Richards v. Washington Terminal Co.,* 233 U.S. 546, 556–58, 34 S.Ct. 654, 658, 58 L.Ed. 1088 (1914), where the Supreme Court held that even though a defendant's activity is so important to the public that he is given the power of eminent domain, if it causes an unreasonable invasion of another's property interests, defendant will be liable for damages for the nuisance.

At oral argument, Appellee suggested that even with a "state of the art" facility some obnoxious odors may well be emitted from the site. When suggestions were made that such emissions might well necessitate the obtaining of sufficient property (or easement rights) by WSSC to contain such odors on site, it was proffered that to do so would be so costly as to be economically unfeasible and/or impossible. Without accepting the logical inconsistency of WSSC's position that, first, it is not maintaining a nuisance and that, second, it would have to purchase so much land to contain the smell that it would be financially impossible, we note that its position assumes that the nuisance burden it creates should be borne only by the Site II neighbors, rather than

spread through condemnation costs or damages [5] to all of its users, *i.e.*, the sources of the material creating the odors. WSSC's position is that it can create a nuisance with impunity. It does not acknowledge that it can allot the costs of the damage it creates throughout its user base by additional condemnation financed by charges directly or indirectly assessed against its users, or through damages similarly financed.

If the users within the entire area serviced by WSSC, through the operation of Site II, are going to inflict the odors generated by the treatment of their sludge on a limited number of Site II neighbors, we see no reason why they should not be required to alleviate that damage or compensate those they damage. That, as we see it, can be accomplished by operating an odor-free facility, obtaining sufficient property to contain odors on site, or by the payment of damages.

Appellee, during oral argument, forcefully argued that at the time it built the composting facility they used the "state of the art" technology and, accordingly, should not be held liable. We said in *Little v. Union Trust Co. of Maryland,* 45 Md.App. 178, 412 A.2d 1251 (1980), that "a 'nuisance exists because of a violation of an absolute duty so that it does not rest on the degree of care used....'" *Id.* at 185, 412 A.2d 1251 (quoting *Sherwood Bros., Inc. v. Eckard,* 204 Md. 485, 493, 105 A.2d 207 (1954)). *See also Benson v. Loehler,* 228 Md. 55, 60, 178 A.2d 909 (1962); *Edwards v. Chadwick,* 22 Md.App. 140, 155, 321 A.2d 792 (1974). *See generally Sherwood Bros. v. Eckard,* 204 Md. 485, 493, 105 A.2d 207 (1954) (noting distinction between nuisance and negligence); Gilbert, *Maryland Tort Law Handbook* § 18.0

---

**5.** Condemnation or purchase of fee simple property *or easement rights* would be a one-time cost whereas damages might be continuing or intermittent into the future. Maryland Annotated Code art. 29, § 1–202(b) (1990), provides that "WSSC may purchase in fee or as an easement property for the construction, extension, or maintenance of a project the WSSC considers necessary to carry out the provisions of this article."

at 185 (1986) (nuisance is distinguished from negligence in that even though a person or corporation complies with all laws, rules and regulations they might nevertheless commit a nuisance).

In the instant case, extensive testimony was presented that WSSC's operation of Site II interfered with the use and enjoyment of Appellants' properties. Several employees from Appellant companies testified that there was a foul odor in the air that could not be detected prior to the operation of the composting facility. Several employees became nauseated and complained of headaches. These complaints related to odors both inside and outside of the various buildings operated by Appellants.[6] There was also testimony that the smells remained for days and sometimes weeks depending on the weather.

The evidence showed that, on occasion, the vents on some of Appellants' buildings allowing fresh air intake had to be closed and inside air recirculated because of odor. Additionally, when the intakes were open, the intake filters had to be replaced on a weekly rather than a monthly basis, which was more costly. One of the Appellant companies cancelled plans to double the size of its facility in part because of the odor emanating from the composting site.

■ We believe that the evidence might justify a finding by the trier of fact that the odors complained of are such that they produce "actual physical discomfort to persons of ordinary sensibilities, tastes and habits" thus, entitling the offended to damages. *Bishop Processing Co.*, 213 Md. at 474, 132 A.2d 445; *Meadowbrook Swimming Club*, 173 Md. at 645, 197 A. 146. We hold that the trial court erred when it ruled that negligence was a necessary element of the tort of nuisance. We shall vacate the judgment on the nuisance count.

---

**6.** There was testimony that at one point steamy and decaying sludge was placed in outdoor football field size piles 15 feet high. Eventually it came to be placed primarily indoors.

Appellants argue further that the trial court erred in equating the standard of proof necessary to establish a non-possessory taking with the standard of proof necessary to establish a nuisance. In granting WSSC's motion for judgment, the trial judge said:

The second basis upon which I grant the motion on the nuisance, is that the law is set forth not only in [*Maryland Port Admin. v.*] *QC* [*Corp.*, 310 Md. 379, 529 A.2d 829 (1987) ], but language in *Electro–Nucleonics* [, *Inc. v. WSSC*, 315 Md. 361, 554 A.2d 804, *cert. denied*, 493 U.S. 854, 110 S.Ct. 158, 107 L.Ed.2d 115 (1989) ] in that the Court can find no substantial diminution in the use of any of these properties by any of the Plaintiffs as the result of the odor.

The evidence necessary to establish a claim for nuisance is different from that necessary to establish a non-possessory taking. To establish a nuisance claim one must show interference with one's interest in the enjoyment of his/her property, *Exxon Corp. v. Yarema*, 69 Md.App. 124, 148, 516 A.2d 990 (1986), whereas a taking requires that a landowner be deprived of all beneficial use of the land. *Pitsenberger v. Pitsenberger*, 287 Md. 20, 34, 410 A.2d 1052, *appeal dismissed*, 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10, *reh'g denied*, 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980). Thus, an action based on an unconstitutional taking is distinct from a nuisance action. *Bd. of Educ. of Prince George's County v. Mayor and Common Council of the Town of Riverdale*, 320 Md. 384, 388, 578 A.2d 207 (1990). See *Taylor*, 130 Md. 133, 99 A. 900, where the Court of Appeals held that although the defendant's construction of a sewage disposal plant did not result in a taking of plaintiff's property, the defendant could be held liable in damages for nuisance.

In this case, the trial judge's reliance on *QC Corp.* and *Electro–Nucleonics* was misplaced as those cases dealt with non-possessory takings and not nuisance claims. Appellants never claimed in the nuisance count that the operation of Site II constituted a taking of their lands. That

argument was made in the other counts. Thus, the trial judge committed error.

## II. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD CONSIDER WHETHER WSSC'S USE OF SITE II SUBSTANTIALLY INTERFERED WITH APPELLANTS' USE AND ENJOYMENT OF THEIR LANDS IN DETERMINING THE VALUE OF THE RESTRICTIVE COVENANTS.

The trial judge, relying on *QC Corp.*, instructed the jury that, "[i]n the determination of any changes of value of the Plaintiffs' property, you may consider whether there was substantial interference with the use and enjoyment of the property by Plaintiffs' resulting from extinguishment of the covenants." Appellants argue that the trial court's instruction erroneously suggested that in addition to proving measurable value, they had to prove that an extinguishment of the covenants would "substantially interfere" with the use and enjoyment of their properties.

In *QC Corp.*, the issue was *whether* there was a sufficiently substantial interference with a party's land to effect a non-possessory taking. In the case *sub judice*, the parties stipulated in open court that the covenants had been extinguished thus, there was no need for the jury to decide if there was a substantial interference with the use and enjoyment of Appellants' land. Therefore, the only issue for the jury to determine was the value of Appellants' covenant rights pursuant to the inverse condemnation claims. Hence, the *QC Corp.* instruction was irrelevant and improper.

## III. EVIDENTIARY ISSUES.

Appellants have also raised several other issues relating to the admissibility of certain evidence. Because we have decided to remand this case for a new trial, and in light of the fact that a new trial may proceed in a different fashion, we find it unnecessary to address all of the remaining issues. We believe, however, that in at least one instance

the court committed clear error; therefore, we will comment upon that issue.

## A. THE TRIAL COURT'S ADMISSION OF HEARSAY APPRAISALS WAS ERRONEOUS AND PREJUDICIAL.

■ The appraisals at issue were prepared at the request of AT & T and Computer Entry Systems (now BancTec Systems, Inc.). They were furnished to Appellee during discovery and offered into evidence by Appellee. The trial court admitted these documents, over objection, pursuant to the business records exception to the hearsay rule, codified in section 10–101 of the Maryland Courts and Judicial Proceedings Article (1989). At trial and now on appeal, Appellants contend that not only were the documents not properly authenticated but they contain inadmissible hearsay. We find it necessary to point out that Appellants' hearsay allegation is correct; these appraisals do not qualify as business records.

Section 10–101(b) permits the admission of a business record or writing "made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event ... to prove the act, transaction, occurrence, or event." In addition, it must also be "[t]he practice of the business ... to make such written records of its acts at the time they are done...." § 10–101(c). Appellee discussed both the authentication and foundation necessary to admit a business record but failed to address the initial question of whether the appraisals qualify as business records.

Recently, in *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 710–713, 591 A.2d 544 *cert. granted,* 324 Md. 90, 595 A.2d 1077 (1991), we discussed the characteristics of a business record which guarantees its reliability and trustworthiness. It is essential that the business record possess these qualities in order to justify the introduction of evidence which is generally hearsay in nature. We relied on language from *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1947), and *Wigmore on Evidence* (1974)

for reasons guaranteeing the "circumstantial trustworthiness" of business records.

According to 5 Wigmore on Evidence § 1522 (1974), the typical record entry made in the regular course of business has a circumstantial guarantee of trustworthiness because:

(1) the needs of the entrant and the business require a habit of accuracy and the influence of this habit may be relied upon to prevent mistakes and counteract the possible temptation to make misstatements purposely;

(2) the regular dependence of the business upon the entries will almost certainly detect any errors or misstatements and thus misstatements can be made safely only by a systematic and comprehensive plan of falsification accomplishable only by the most daring and unscrupulous; or

(3) in addition to the first two reasons, the entrant made the record under a duty to an employer or supervisor and thus is under the additional risks of censure and disgrace for any inaccuracies.

87 Md.App. at 710, 591 A.2d 544.

Although stated differently, these findings by the Supreme Court are consistent with the reasons for circumstantial trustworthiness set forth in Wigmore.... The report was properly excluded because the railroad did not depend on the report ... to run the daily operation of its railroad business and, thus, it could not be assumed that the report was a product of a necessary habit of accuracy. Moreover, inaccuracies in the report would not have had a detrimental effect on the railroad and therefore would not have been detected by the almost continuous use of the information contained therein. Finally, the entrant was not under a duty to a superior to make the report objectively accurate, and thus the report contained the railroad's version of events.

87 Md.App. at 712, 591 A.2d 544.

Business records having these characteristics "which have been found to be admissible ... are 'payrolls, accounts

receivable, accounts payable, bills of lading and the like,'; statements in a medical record . . .; items in a police report which are within the personal observation of the investigating officer; and reports required by law." *Id.* at 710–11, 591 A.2d 544 (citations omitted).

In *Armstrong,* we held that a dust count report made by an engineer at a steel corporation did not meet the criteria of a business record. We opined:

> The investigation and report were not required by law, but were made at the request of one of the company vice-presidents. On its face, the report appears to be a single or, at most irregular, request. Nevertheless, even if dust count reports were made regularly by Bethlehem Steel Corporation, there was nothing to show that they are a necessary component of the daily operation of its business as a steel company. Therefore, the report is not inherently trustworthy as the product of a necessary habit of accuracy, and any inaccuracies would have remained undetected because Bethlehem Steel Corporation did not regularly rely on its contents. Moreover, because Bethlehem Steel Corporation did not apparently depend on the accuracy of the information contained in the report, we cannot infer that the motive behind its creation was objective accuracy rather than the creation of a subjective version of events.

*Id.* at 712, 591 A.2d 544.

The appraisals in the present case also do not possess the characteristics of a business record. The appraisals were requested by AT & T and BancTec; they were not required by law. Neither company's business required the appraisal in order to function on a day to day basis. Thus, even if they were regularly requested, it would not be the result of a "habit of accuracy". Furthermore, mistakes would not be detected because the companies did not continuously rely on the information contained in the reports. They had no effect on the operation of the business. Therefore, the appraisals do not have the indicia of reliability necessary to

qualify under the exception. The court erred in admitting the appraisals which do not qualify as business records.

## CROSS APPEAL

I. DID THE TRIAL COURT PROPERLY PERMIT THE JURY TO CONSIDER INVERSE CONDEMNATION CLAIMS OF THOSE APPELLANTS WHO PURCHASED THEIR LAND AFTER THE RESTRICTIVE COVENANTS WERE EXTINGUISHED ON JULY 8, 1980?

Appellee argues that Appellants CAE–Link Corp., BancTec Systems, Inc., and AT & T do not have standing to maintain an inverse condemnation action because they purchased their land in the MIP subsequent to WSSC's July 8, 1980, extinguishment of the covenants. Appellee buttresses this argument by contending that by purchasing their land after July 8th the late-takers could not purchase the extinguished covenant rights because the rights no longer existed. Appellee also argues that the sellers of the land could not convey to the late-takers a greater estate or interest in the land than the seller itself held. Thus, WSSC concludes the owners at the time of the taking, not the present owners, are entitled to compensation.

Appellants, on the other hand, make several opposing arguments. First, they argue that there never was a "taking" of the covenants, only an extinguishment as a result of the condemnation of Site II. Second, they contend that the covenants were not condemned in 1980, nor have they ever been condemned, thus title to the covenants has not vested in WSSC. Third, Appellants maintain that because compensation has not been paid, the covenants have not been taken. Lastly, Appellants argue that their sellers assigned the covenants and thus, in the alternative, claim the right to maintain suit on the covenants or receive the compensation when its amount is properly determined.

The covenants which the parties agree were breached by operation of Site II provide in part:

No waste material or refuse may be dumped or permitted to remain in or upon any part of the property outside of buildings.

No emission of objectionable odors outside the lot line shall be permitted....

The covenants also prohibit the use of land in the MIP as a dump or sanitary fill. The parties stipulated that the covenants were extinguished when WSSC began the operation of Site II, *i.e.*, on July 8, 1980. By that stipulation, the parties have agreed that the covenants did not thereafter exist. *See Electro-Nucleonics v. WSSC*, 315 Md. 361, 376, 554 A.2d 804 (1989) (three-year statute of limitations began to run against inverse condemnation action based on loss of benefit of restrictive covenant when servient estate was taken for purposes inconsistent with the covenant). Until such time as the covenants were breached by WSSC, and extinguished by virtue of the breach, no cause of action could arise. It was only upon and subsequent to that extinguishment that the right to compensation arose. Accordingly, at that point, July 8, 1980, the then owners had a chose in action.

█ In the case *sub judice*, CAE–Link's predecessor in interest, the Singer Company, contracted to purchase its land by an Agreement dated September 30, 1980. That agreement does not contain any express assignment of any chose in action which then existed. It purported to convey all rights to compensation from "taking" on or after that date.

Loss or damage to the Property ... as a result of the exercise of the power of eminent domain ... *between the date of this Contract and the time of settlement* shall not void or impair this Contract, but Purchaser, upon completing settlement, shall be entitled to the eminent domain award or compensation ... and to an assignment of all claims to such compensation or award.... [Emphasis added.]

The parties have stipulated that the covenants had already been extinguished by September 30, 1980. Similarly, Banc-

Tec's predecessor in interest, Computer Entry Systems ("CES"), contracted to purchase its property by a Purchase Agreement. The Sales Contract contains a provision virtually identical to that found in the Singer contract relating to the purchaser's entitlement to any eminent domain award or compensation in the future. The date of that agreement was also subsequent to July 8, 1980. Therefore, that language, as to eminent domain, was not intended to relate to the prior exercise of eminent domain (inverse condemnation), but applied to any subsequent exercise of such power. Thus, as to CAE–Link and BancTec, no proper assignment of the right to maintain an action in inverse condemnation was made.

As to AT & T, the documents in its chain of title show that the inverse condemnation claim was purportedly assigned to it by its predecessor, SDL/Data Crown, Inc. In the Agreement of Purchase and Sale dated March 15, 1984, between AT & T and SDL/Data Crown, an inverse condemnation claim was expressly assigned to AT & T. Paragraph 3.6 of this Agreement provides, in pertinent part:

> Seller has a claim against the Washington Suburban Sanitary Commission for damages resulting from the operation of a facility for the storage and processing of sewerage sledge [sic]. Seller hereby agrees to authorize Purchaser to use its name in prosecution of said claim, at Purchaser's sole expense, and Purchaser shall be entitled to any and all proceeds of said claim.

Thus, if SDL/Data Crown, itself had the chose in action, AT & T would have received it. SDL/Data Crown received the property by deed dated October 1, 1981. That deed contained no reference to any assignment of a chose in action by SDL/Data Crown's predecessor, Crown Life Insurance, the entity that possessed the property on July 8, 1980. Thus, SDL/Data Crown did not possess that which it purported to convey to AT & T in that SDL/Data Crown had no

right to maintain the suit.[7] The trial court erroneously concluded that CAE–Link, BancTec and AT & T had standing to prosecute the inverse condemnation claims in this case. We thus shall reverse its denial of WSSC's motion for partial summary judgment as to the inverse condemnation counts as they relate to CAE–Link, BancTec and AT & T.

As we have held that the trial court should have dismissed AT & T's inverse condemnation claim upon WSSC's Motion for Partial Summary Judgment, we shall not address the issue of limitations.

JUDGMENT DENYING WSSC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE INVERSE CONDEMNATION COUNTS AGAINST CAE–LINK, BANCTEC, AND AT & T IS REVERSED; JUDGMENT ON REMAINING ISSUES VACATED; CASE REMANDED FOR NEW TRIAL; COSTS TO BE PAID 75% BY WSSC, 25% BY CAE–LINK, BANCTEC AND AT & T.

---

7. The deeds of the respective parties contained standard "together with" clauses. Generally "together with" clauses convey rights still attached to the land being conveyed. Once a covenant is extinguished, it cannot be conveyed because it does not exist. Under the circumstances of this case, the owner, at the time of the extinguishment, became possessed of a chose in action for damages. That chose in action was not then incidental to an existing property right, it had independent existence. In the case at bar, the possessors of the chose in action, as far as the record reflects, have not assigned that right.